IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC KINGSMILL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| POLICE OFFICER CHRISTOPHER | : | |
| SZEWCZAK, and | : | |
| CITY OF PHILADELPHIA | : | NO. 15-2386 |

MEMORANDUM

Dalzell, J.                                                          July 30, 2015

## I.      Introduction

We consider here defendants' motion to dismiss plaintiff Eric Kingsmill's amended

complaint. Kingsmill brings this action pursuant to 42 U.S.C. § 1983 against the defendants,

Police Officer Christopher Szewczak and the City of Philadelphia. We have jurisdiction under 28

U.S.C. § 1331.

As will be seen by our analysis below, Kingsmill has pled sufficient facts, accepted as

true, to demonstrate that Officer Szewczak violated his Fourteenth Amendment substantive Due

Process rights on a state-created danger theory of liability. Officer Szewczak is not entitled to

qualified immunity because a reasonable officer at the time of the incident would have known

that the alleged conduct was unlawful. But Kingsmill's Monell claim against the City of

Philadelphia fails as a matter of law. We will therefore deny defendants' motion to dismiss

Count I of the amended complaint against Officer Szewczak, but grant their motion to dismiss

Count II against the City of Philadelphia.[1]

---

[1] Oddly, on page 11 of their Memorandum in support of their motion, defendants at this juncture only seek to "dismiss Plaintiff's federal-law claims without prejudice," apparently implicitly inviting a motion for leave to file a second amended complaint conformably with Fed. R. Civ. P. 15(a)(2).

## II.    <u>Standard of Review</u>

A defendant moving to dismiss under Fed R. Civ. P. 12(b)(6) bears the burden of proving that the plaintiff has failed to state a claim for relief. <u>See</u> Fed. R. Civ. P. 12(b)(6); <u>see also</u>, <u>e.g.</u>, <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir. 2005). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a facially plausible claim to relief. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.

As the Supreme Court stresses, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action…do not suffice." <u>Id.</u> Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." <u>Twombly</u>, 550 U.S. at 555.

In the wake of <u>Twombly</u> and <u>Iqbal</u>, our Court of Appeals laid out a two-part test to apply when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted). In deciding a motion to dismiss, we may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," and any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims

are based on the document." <u>Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.</u>, 998

F.2d 1192, 1196 (3d Cir. 1993).

We recite the facts as they appear in the amended complaint.

### III.   <u>Factual Background</u>

At about 3:00 P.M. on February 9, 2014, plaintiff Eric Kingsmill was walking on the

sidewalk near the intersection of Norris and Thompson Streets in Philadelphia, Pennsylvania,

when he was approached by Joseph Brown. Am. Compl. at ¶¶ 7-8. Brown -- not a party in this

case -- demanded money, and, when Kingsmill refused, Brown pushed him against a parked car

and withdrew a length of pipe from his jacket sleeve. <u>Id.</u> at ¶¶ 8-9. Kingsmill, defending himself,

punched Brown in the torso. <u>Id.</u> at ¶ 10.

Defendant Police Officer Christopher Szewczak watched this altercation from his patrol

car, less than twenty feet away. <u>Id.</u> at ¶ 11. As Kingsmill defended himself, Officer Szewczak

"commanded" him to "get over here." <u>Id.</u> at ¶ 12. Kingsmill immediately complied, disengaged

from Brown, and walked to within three feet of Officer Szewczak. <u>Id.</u> at ¶ 13. Officer Szewczak

stated, "I seen you hit that dude," to which Kingsmill replied, "Did you see him hit me." <u>Id.</u> at ¶

15. Kingsmill stood facing Officer Szewczak with his back to Brown. <u>Id.</u> at ¶¶ 13, 16. Officer

Szewczak, looking in Kingsmill's direction, "watched as [Brown] approached with a steel pipe

and/or extendable metal baton in his raised right arm." <u>Id.</u> at ¶ 16. Officer Szewczak "watched as

[Brown] struck [Kingsmill] in the face" with the pipe. <u>Id.</u> at ¶ 17. Officer Szewczak "had the

opportunity to warn" Kingsmill, but neither warned him nor intervened to stop the attack. <u>Id.</u> at

¶¶ 18-19. Officer Szewczak never ordered Brown to stop or halt. <u>Id.</u> at ¶ 20.

After Brown attacked Kingsmill, Officer Szewczak told Kingsmill, "I am not calling an

ambulance. I am not taking this report." <u>Id.</u> at ¶ 23. Officer Szewczak ordered Brown to "Get

your shit and get out of here." Id. Officer Szewczak did not call an ambulance to assist Kingsmill, did not arrest Brown, and did not make a police report concerning the attack. Id. at ¶¶ 24-26.

That day, and on each of the next four days, Kingsmill's mother, Victoria Kingsmill, reported the attack to the 26th District Headquarters of the Philadelphia Police Department. Id. at ¶ 27. Each time, the police refused to make a written report. Id. On February 14, 2014, at the direction of the 26th District's Captain, Police Officer Maritza Mendez made a report of the attack. Id. at ¶ 28. On March 5, 2014 Brown was arrested and charged in connection with the February 9, 2014 attack. Id. at ¶ 29. On November 14, 2014, after a trial before the Hon. Abbe Fletman in the Philadelphia Court of Common Pleas, Brown was convicted of aggravated assault, simple assault, recklessly endangering another person, and possession of an instrument of a crime. Id. at ¶ 30.

Kingsmill alleges that Officer Szewczak's actions created a danger whereby he would suffer serious injury, substantially increased the risk that he would suffer serious injury, placed him in danger of direct and foreseeable harm, and created an opportunity for harm that would not have existed otherwise. Id. at ¶¶ 31-34. Kingsmill alleges that Officer Szewczak's order to "get over here" created a "special relationship" between them. Id. at ¶ 36. He also claims that the City of Philadelphia "developed and maintained [policies] or customs exhibiting deliberate indifference to the constitutional rights of persons in the City of Philadelphia which caused the violation of" his rights. Id. at ¶ 42. Kingsmill alleges a policy or custom of inadequate supervision and discipline of Officer Szewczak "whose prior constitutional violations and acts of misconduct were tolerated by the City of Philadelphia." Id. at ¶ 44.

**IV.**  **Discussion**

A cause of action under Section 1983 requires only two allegations: a person has deprived the plaintiff of a federal right, and that person acted under color of state or territorial law. Gomez v. Toledo, 446 U.S. 635, 640 (1980); see also Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005).

Moving to dismiss Count I of the amended complaint, defendants argue that Kingsmill fails to state a substantive Due Process claim under the Fourteenth Amendment because he does not adequately plead either that he enjoyed a "special relationship" with the defendants or the elements of a state-created danger claim. MTD at 6, 8-9. Defendants also claim that Officer Szewczak is entitled to qualified immunity. Id. at 10. Defendants, moving to dismiss Count II of the amended complaint, contend that Kingsmill's allegations regarding a municipal policy or custom are insufficient to state a viable Monell claim. Id. at 11.

We consider these arguments in turn.

**A.**  **Count I: Kingsmill v. Officer Szewczak**

Section 1983 provides remedies for deprivation of rights established in the Constitution or federal laws, but does not by its own terms create substantive rights. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The substantive component of Due Process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (internal quotations omitted). But substantive due process does not generally confer upon one a right to governmental aid "even where such aid may be necessary to secure life, liberty, or property

interests of which the government itself may not deprive the individual." <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196-97 (1989) (concluding that generally "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). But if the state affirmatively acts to restrain an individual's freedom to act on his own behalf "through incarceration, institutionalization, or other similar restraint of personal liberty," then that deprivation of liberty triggers the Due Process Clause's protections. <u>Id.</u> at 200. It is the state-imposed limit on an individual's freedom to act on his own behalf -- not its knowledge of the individual's predicament or its expression of intent to help -- that creates the affirmative duty to protect. <u>Id.</u> Because the state is not constitutionally required to provide protection, it cannot be liable for failing to render it, even when such service would have prevented the private injury. <u>Brown v. Commonwealth of Pa., Dep't of Health Emergency Med. Servs. Training Inst.</u>, 318 F.3d 473, 477 (3d Cir. 2003).

But there are two exceptions to this general rule of non-liability: the special relationship and state-created danger. <u>Id.</u> at 478. First, the state has an affirmative duty to protect when there is a "special relationship" with the injured party because the state "by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." <u>Id.</u> Second, the state "may be liable for constitutionally protected rights, even in the absence of a special relationship with an individual, when the state, through its affirmative conduct, creates or enhances a danger for the individual." <u>Id.</u> This state-created danger exception applies "when the state, through some affirmative conduct, places the individual in a position of danger." <u>Id.</u>

We consider whether Kingsmill states a plausible claim for relief under either exception.

1.      **Special Relationship**

Officer Szewczak argues that Kingsmill cannot prevail on a special relationship theory of liability because Officer Szewczak did not restrain him from protecting himself and "calling [Kingsmill] over to a patrol car is a far cry from subjecting" him to incarceration, institutionalization, or another similar restraint of liberty. MTD at 7. Kingsmill argues that Officer Szewczak "seized" him by calling him over to the patrol car, limiting his ability to protect himself thereby creating a duty to protect him. Pl. Resp. at unnumbered p. 11.

An affirmative duty to protect may arise out of certain special relationships between the state and particular individuals. Morrow v. Balaski, 719 F.3d 160, 167 (3d Cir. 2013). When a state holds an individual in custody against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for one's safety and general well-being. Id. (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976) (state required to provide adequate medical care to prisoners), and Youngberg v. Romeo, 457 U.S. 307, 324 (1982) (state required to ensure the reasonable safety of involuntarily committed mental patients)). This duty to protect does not arise from the state's knowledge of the individual's predicament or its expression of intent to help, but rather from the limits the state imposes on an individual's ability to act on his own behalf. Id. at 168.

The hallmark of a special relationship is custody: "full time severe and continuous state restriction of liberty." D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1371 (3d Cir. 1992) (characterizing those so restrained as unable to provide for themselves, to seek outside help to meet their basic needs, or to leave). Such custody is both involuntary and comprehensive. Torisky v. Schweiker, 446 F.3d 438, 445 (3d Cir. 2006) (explaining these concepts in the context of foster care placement).

7

Because Kingsmill was not placed in such an involuntary and comprehensive form of custody, he had no special relationship with Officer Szewczak that gave rise to an affirmative duty to protect. Custody in the special relationship context means incarceration, institutionalization, or other similar restraint of personal liberty. Morrow, 719 F.3d at 167. Kingsmill alleges that when Officer Szewczak summoned him to his patrol car in the middle of his altercation with Brown, he "respond[ed] immediately to [Officer] Szewczak's assertion of police authority." Am. Compl. at ¶ 13. Kingsmill "walked to within three feet of Officer Szewczak" and stood facing him throughout the incident. Id. at ¶¶ 13-17. Kingsmill complied with Officer Szewczak's order, thereby belying the involuntary nature of his alleged custody. More salient, however, is that Kingsmill's alleged custody was not of the comprehensive Estelle-Youngberg type. He was merely standing on the street outside Officer Szewczak's patrol car as the result of the officer's hail -- not incarcerated, involuntarily committed, or similarly precluded from leaving or fending for himself.

Thus, Kingsmill cannot prevail on his Section 1983 claim against Officer Szewczak on the theory that they enjoyed a special relationship that gave rise to an affirmative duty on Officer Szewczak's part to protect him. We next consider whether Kingsmill might nonetheless prevail on a state-created danger theory of liability.

## 2. State-Created Danger

Officer Szewczak contends that Kingsmill cannot prevail on a state-created danger theory of liability because he has failed to adequately plead that Officer Szewczak carried out an affirmative act or that his conduct shocked the conscience. MTD at 8-10. Kingsmill counters that Officer Szewczak's command to approach the patrol car was both an assertion of police authority and an affirmative act. Pl. Resp. at unnumbered p. 10. Kingsmill also argues that Officer

Szewczak's conduct shocks the conscience because the officer had time to make an unhurried judgment, appreciated the danger Kingsmill was in, and "watched in silence as the pipe-wielding Brown walked up behind" him. Id. at unnumbered p. 6.

A plaintiff may use the state-created danger exception to establish a constitutional violation of his rights in suits brought under Section 1983 when the state acts to create or enhance a danger that deprives the plaintiff of his Fourteenth Amendment right to substantive Due Process. Morrow, 719 F.3d at 177. The state-created danger theory operates outside of the strictly custodial context required to prevail under the special relationship exception. See, e.g., D.R. by L.R., 972 F.2d at 1373 (distinguishing the state-created danger theory from the special relationship theory based on whether the individual is in Estelle-Youngberg-type custody).

To prevail on this theory, a plaintiff must show: (1) the harm ultimately caused was foreseeable and fairly direct, (2) a state actor acted with a degree of culpability that shocks the conscience, (3) a relationship between the state and the plaintiff existed such that the plaintiff was either a foreseeable victim of the defendant's acts or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the general public, and (4) a state actor affirmatively used his authority in a way that created a danger to the individual or that rendered the individual more vulnerable to danger than had the state not acted at all. Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006); see also, e.g., Kneipp, 95 F.3d at 1208 (articulating these four elements as our Court of Appeals initially developed them).

As the parties confine their arguments to the second and fourth elements of the test set forth in Bright, we first consider those two factors.

<blockquote>
<b>a.     Whether Officer Szewczak Acted  With
<u>A Degree Of Culpability That Shocks The Conscience</u></b>
</blockquote>

With respect to the second factor, the level of culpability required to shock the

conscience depends upon the extent to which a state actor is required to act under pressure.

<u>Sanford v. Stiles</u>, 456 F.3d 298, 301 (3d Cir. 2006) (explaining why the shocks the conscience

standard has such "an elusive quality to it."). The level of culpability required to shock the

conscience increases as the duration the state actor has to deliberate decreases. <u>Id.</u> at 310. There

are three possible standards to determine whether a state actor's behavior shocks the conscience:

(1) deliberate indifference, (2) gross negligence or arbitrariness, or (3) intent to cause harm. <u>Id.</u> at

306. When there is sufficient time to deliberate and make an unhurried judgment, deliberate

indifference is sufficient. <u>Id.</u> at 310. In a hyper-pressurized environment, such as a high-speed

chase, an intent to cause harm is usually required. <u>Id.</u> In the middle -- when there is some

urgency precluding an unhurried judgment, but the state actor does not have to make a split-

second decision -- we ask whether the state actor "consciously disregarded a great risk of harm."

<u>Id.</u> (clarifying that actual knowledge of the risk may not be necessary if the risk is obvious).

Officer Szewczak argues that Kingsmill "merely alleges that Officer Szewczak should

have warned [Kingsmill] of an impending attack," and this failure to warn "is not conscience

shocking in light of cases like <u>Sanford</u>." MTD at 10. Kingsmill asserts that "the facts, as alleged,

suggest that when Officer Szewczak used his authority to immobilize <u>only</u> Eric Kingsmill,

leaving Joseph Brown unchecked, the unhurried officer appreciated the danger to which he was

exposing" him, demonstrating "malevolence more than deliberate indifference to [his] well-

being." Pl. Resp. at unnumbered p. 6 (emphasis in original). While Kingsmill contends that he

should not be required to demonstrate that Officer Szewczak had an actual intent to cause harm,

he alleges he can meet that burden because Officer Szewczak's order to Brown to flee the scene

and his refusal to render or summon assistance are probative of such intent. Id. at unnumbered p. 7.

Kingsmill's well-pled facts, accepted as true, suffice to demonstrate that Officer Szewczak acted with a degree of culpability that shocks the conscience. Kingsmill pleads that Officer Szewczak commanded him, while he was defending himself from Brown, to leave the altercation and approach the patrol car, "less than 20 feet" away. Am. Compl. at ¶¶ 10-12. While Officer Szewczak and Kingsmill spoke, with Kingsmill "within three feet of Officer Szewczak," Officer Szewczak watched as Brown approached from behind Kingsmill and struck him with a steel pipe. Id. at ¶¶ 13, 15-17. After the attack, Officer Szewczak told Kingsmill he would neither call an ambulance nor take a report and ordered Brown to leave. Id. at ¶ 23. Accepting the facts as pled, Officer Szewczak did not have the benefit of time to make an unhurried judgment, but he was not forced to make a split-second decision as to what to do: Kingsmill had time to walk to within three feet of the patrol car and exchange words with the officer before Brown attacked. Kingsmill has pled sufficient facts, accepted as true, to demonstrate that Officer Szewczak consciously disregarded a great risk of harm of which the officer either actually knew -- because he saw Brown approach with the pipe -- or which was obvious based on the circumstances of the encounter he witnessed. Kingsmill also pleads sufficient facts, accepted as true, to demonstrate that under the higher standard required when a state actor must make a split-second decision -- intent to harm -- he has still pled a plausible claim for relief, as Officer Szewczak's post-attack comments and refusal to render aid are probative of such intent.

Kingsmill therefore pleads sufficient facts, accepted as true, to demonstrate that Officer Szewczak acted with a degree of culpability that shocks the conscience under either the

conscious disregard or intent to harm standard. We next consider the parties' arguments regarding the fourth factor of the state-created danger test.

### b.     Whether Officer Szewczak Affirmatively Acted To Render Kingsmill More Vulnerable To Danger

With respect to the fourth factor, we ask whether the state actor affirmatively acted to create the danger or render the plaintiff more vulnerable to it. D.R. by L.R., 972 F.2d at 1373. There must be some "level of intermingling of state conduct with private violence" to support liability. Id. at 1375. Though the line between action and inaction may sometimes be unclear, it is "misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." Bright, 443 F.3d at 282. To satisfy the fourth element, a plaintiff must show: (1) a state actor exercised his authority, (2) the state actor took affirmative action, and (3) that affirmative act created a danger to the plaintiff or rendered the plaintiff more vulnerable to the danger than if the state actor had not acted at all. Ye v. United States, 484 F.3d 634, 639 (3d Cir. 2007) (citing Bright, 443 F.3d at 281-82).

Officer Szewczak contends that his failure to warn Kingsmill of Brown's approach is inaction, not an affirmative act, and to the extent his summoning of Kingsmill to his patrol car was an affirmative act, his "mere words did not prevent Plaintiff from defending himself, and his words certainly did not restrict Plaintiff's personal liberty to the same degree as incarceration or institutionalization." MTD at 9. Kingsmill counters that (1) Officer Szewczak exercised his authority by summoning Kingsmill to the patrol car, (2) Officer Szewczak's assertion of police authority to summon Kingsmill was an affirmative act, and (3) this summons, which Kingsmill believes to be a seizure, increased Kingsmill's exposure to harm because it "rendered Kingsmill

more vulnerable to danger than if the officer had not acted at all." Pl. Resp. at unnumbered pp. 9-11.

Kingsmill's amended complaint satisfies all three elements of the fourth prong of the state-created danger test. Kingsmill's well-pled factual allegations suffice to demonstrate that Officer Szewczak affirmatively used his authority in a way that rendered him more vulnerable to danger than if the officer had not acted at all. First, Officer Szewczak exercised his authority when he commanded Kingsmill, by name, to approach the patrol car. Regardless of whether Kingsmill was "seized," a police command to an individual to stop what he is doing and approach constitutes an exercise of authority. Second, Officer Szewczak took an affirmative act: he verbally ordered to Kingsmill to stop and come forward.[2] Third, Officer Szewczak's affirmative act -- calling Kingsmill over to the car -- rendered him more vulnerable to the danger posed by Brown than if Officer Szewczak had not acted at all. Before Officer Szewczak summoned Kingsmill, he was in the middle of a physical altercation with Brown, who was armed with a length of pipe. Am. Compl. at ¶¶ 9-11. Had Officer Szewczak not acted, Kingsmill could have continued to defend himself, uninterrupted. After Officer Szewczak ordered Kingsmill to come forward, Kingsmill turned his back to Brown, walked toward Officer Szewczak, and began exchanging words with him. Id. at ¶¶ 13, 15-16. So engaged, with his back turned, Kingsmill was more vulnerable to Brown's attack from behind.

Kingsmill pleads sufficient facts, accepted as true, to demonstrate that Officer Szewczak affirmatively used his authority in a way that rendered Kingsmill more vulnerable to danger than had he not acted at all.

---

[2] Although "assurances of well-being" are not affirmative acts within the meaning of state-created danger claims, "DeShaney and Bright do not totally foreclose the possibility that words could constitute an affirmative act and a deprivation of liberty." Ye, 484 F.3d at 642. Characterizing Officer Szewczak's order as "mere words" belies the authority with which a uniformed police officer, seated in his patrol car, addresses a member of the public.

Though the parties did not brief the first and third factors of the state-created danger test, we briefly note that Kingsmill's well-pled factual allegations, accepted as true, satisfy those two additional elements. With respect to the first factor, the harm ultimately caused was foreseeable and fairly direct: Kingsmill was injured by a pipe-wielding assailant after Officer Szewczak summoned him away from defending himself from that same pipe-wielding assailant. With respect to the third factor, a relationship[3] between Officer Szewczak and Kingsmill existed such that Kingsmill was a foreseeable victim of Officer Szewczak's acts: Officer Szewczak summoned Kingsmill while he was fighting Brown, and after Kingsmill responded to the officer's hail, Brown attacked him from behind.  Kingsmill's well-pled factual allegations, accepted as true, demonstrate a plausible claim to relief on a state-created danger theory of liability under Section 1983 for a violation of his Fourteenth Amendment substantive due process rights.

We next consider whether Officer Szewczak is entitled to qualified immunity.

### 3.    <u>Qualified Immunity</u>

Officer Szewczak argues that he is entitled to qualified immunity because "it was not clearly established on February 9, 2014, that calling a person over to a patrol car and failing to warn that person of an attack could somehow violate the Due Process Clause." MTD at 11.

---

[3] The "relationship" described in the third factor of this test is different from the special relationship required to impose liability under Section 1983:

> The relationship requirement under the state-created danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense. The special relationship in <u>DeShaney</u>, on the other hand, has a custodial element to it -- the state must affirmatively act to restrain an individual's freedom to act on his or her own behalf either through incarceration, institutionalization, or some other comparable limit of personal liberty.

<u>Kneipp</u>, 95 F.3d at 1209 n.22.

14

Kingsmill argues that Officer Szewczak "acted out of malice, not out of ignorance or confusion concerning the state of the law," and that "[a]t the time of the incident, every reasonable officer in the United States knew that their duty required them to try to protect seized citizens from harm." Pl. Resp. at unnumbered pp. 14-15.

Qualified immunity shields government officials from liability for civil damages to the extent that their conduct did not violate clearly-established constitutional rights of which a reasonable officer would have known. Behrens v. Pelletier, 516 U.S. 299, 305 (1996) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal alterations omitted)). Our Court of Appeals cautions that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Newland v. Reehorst, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (non-precedential); see also, e.g., Mitchell v. Township of Willingboro, 913 F. Supp. 2d 62, 67 (D.N.J. 2012) (quoting Newland for this proposition and rejecting a qualified immunity defense at the Rule 12(b)(6) stage). But as qualified immunity is "an immunity from suit rather than a mere defense to liability," the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 231-32 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) and Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step process for addressing claims of qualified immunity:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . if a violation could be made out on a

> favorable view of the parties' submissions, the next, sequential
> step is to ask whether the right was clearly established.

Id. at 201. Subsequently, the Supreme Court held the sequence of this two-step process to be

optional -- not mandatory -- but frequently beneficial.  Pearson, 555 U.S. at 227, 236.

As explained in Part IV.A.2, taken in the light most favorable to Kingsmill as the non-

moving party, the facts alleged in the amended complaint show that Officer Szewczak's conduct

violated a constitutional right. When a favorable view of the parties' submissions reveals an

alleged constitutional violation, we next inquire whether that constitutional right was clearly

established. Saucier, 533 U.S. at 201.

A defendant asserting qualified immunity bears the burden of demonstrating his

entitlement to that affirmative defense. Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014). To

be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." Anderson v. Creighton, 483

U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful; but it is to say

that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citations

omitted). When we ask whether an allegedly violated right was so clearly established that any

reasonable officer would have known of it, we do so "in light of the specific context of the case,

not as a broad general proposition." George v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013) (quoting

Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). To lose the protections of qualified immunity,

"existing precedent must have placed the statutory or constitutional question beyond debate." Id.

(quoting Ashcroft v. al-Kidd, -- U.S. --, 131 S.Ct. 2074, 2083 (2011)).

While it has been clear since November of 1998 -- when our Court of Appeals decided

Kneipp -- that there is a right to be free from a state-created danger, our inquiry does not end

16

there. See Rivas v. City of Passaic, 365 F.3d 181, 200 (3d Cir. 2004) (observing the state of the

law in the Third Circuit since November of 1998 and continuing the qualified immunity

analysis). The absence of a precedential decision on the constitutionality of the conduct precisely

at issue is not dispositive on the question of whether a right was clearly established, but there

must be some, even if not precise, factual congruence between the relevant precedents and the

conduct at issue. Pro v. Donatucci, 81 F.3d 1283, 1292 (3d Cir. 1996). The ultimate question is

whether an officer had "fair warning" that his conduct deprived the plaintiff of a constitutional

right. Schneyder v. Smith, 653 F.3d 313, 329 (3d Cir. 2011).

But when considering whether the law was clearly established or whether an officer had

fair warning that certain conduct was unlawful, "there is no need that the very action in question

[had] previously been held unlawful." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S.

364, 377 (2009) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)) (internal quotations

omitted). "The unconstitutionality of outrageous conduct obviously will be unconstitutional, this

being the reason, as Judge Posner said, that '[t]he easiest cases don't even arise.'" Id. (quoting

K.H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)). But even when an officer's conduct is "less

than an outrage," an officer can still be on notice that his conduct violates established law. Id. at

377-78 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Although the parties did not identify, and we were unable to locate, a case with a cognate

claim and a constellation of factual averments, this is the type of case where the alleged conduct

is outrageous enough, and the broad contours of the constitutional right sufficiently well-known,

that Officer Szewczak was on notice that his conduct violated Kingsmill's constitutional rights.

Officer Szewczak lured Kingsmill away from a physical altercation, engaged him in

conversation, and then watched as Brown hit Kingsmill in the face with a steel pipe. Officer

Szewczak reacted by telling Brown to flee the scene, declining to make a police report, and refusing to render assistance to the injured Kingsmill.[4]

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." George, 738 F.3d at 572 (quoting al-Kidd, -- U.S. --, 131 S.Ct at 2085). This "mitigate[s] the social costs of exposing government officials to personal liability" by giving them "breathing room to make reasonable but mistaken judgments about open legal questions." Id. Although this particular scenario does not appear to have been considered by our Court of Appeals, the conduct alleged is not the type qualified immunity protects. Any reasonable officer at the time of this incident -- February 9, 2014 – would have known that he had a duty not to place an individual at greater risk of injury from a physical assault by hailing him away from the altercation and then declining to intervene. A reasonable officer would have known that he had a duty not to command such an individual to comply with a directive, so that compliance would increase the risk of harm to him.

This is not a case where the "most that can be said of the state functionaries in this case is that they stood by and did nothing when…circumstances dictated a more active role for them." Bright, 443 F.3d at 285 (quoting DeShaney, 489 U.S. at 203). More can be said: Officer Szewczak did not just stand by and do nothing while Kingsmill was assaulted. Officer Szewczak exercised his authority to command Kingsmill to disengage from a physical altercation, and, as a result of Kingsmill's compliance, Brown was able to attack him from behind. Officer Szewczak's failure to warn Kingsmill that Brown was approaching from behind might appear

---

[4] Sometimes the assertion of qualified immunity, in light of the alleged facts in a complaint, "brings into sharp focus the question of whether the doctrine of qualified immunity is being invoked more than is warranted." Gaymon v. Borough of Collingdale, 2015 WL 4389585, *1 (E.D. Pa. July 17, 2015) (McHugh, J.). While the alleged facts of this case may not be as extreme as those alleged in Gaymon, see id. at *1-2, and may, after discovery, turn out to be otherwise, we nonetheless find Judge McHugh's observation apt.

more akin to the inaction that prior courts have found insufficient to ground liability under a state-created danger theory. But Officer Szewczak did not just fail to warn: his initial hail and interference with the assault in this circumstance placed Kingsmill at risk of additional serious injury. After placing Kingsmill in greater danger than he had been before the officer's intervention -- indeed, the officer did not bother to warn him of Brown's oncoming assault.

Nor is this a case where the exercise of a state actor's discretion did not increase the danger. See, e.g., Morrow, 719 F.3d at 178 (explaining that the temporary suspension of a student did not make the children she had bullied more vulnerable to danger and that the school permitting the student to return after serving the suspension was not an affirmative act). To be sure, Officer Szewczak was not obligated to protect either Kingsmill or Brown, and his knowledge of their altercation was not sufficient to create an affirmative duty to act. But once Officer Szewczak chose to call Kingsmill to his patrol car, and chose to continue their conversation despite Brown's approach, pipe in hand, he put Kingsmill in greater danger of the assault from Brown.

As pled, this case is more than a failure to warn or adequately protect. "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.). Officer Szewczak may not have placed Kingsmill in the physical confrontation with Brown, but observing Kingsmill in such a snake pit, he made it worse by hailing him and commanding him to disengage, leaving him vulnerable to Brown's attack from behind. Such conduct is sufficiently outrageous that a reasonable officer would have known that doing so could violate Kingsmill's constitutional rights.

We find that Kingsmill's right to be free from state-created danger in this particular factual circumstance was clearly established when this incident took place in February of 2014, when this incident took place. Officer Szewczak is therefore not entitled to qualified immunity.

We next consider Kingsmill's <u>Monell</u> claim against the City of Philadelphia.

**B.      <u>Count II: Kingsmill v. City of Philadelphia</u>**

A municipality is not liable for its employees' constitutional torts under a theory of <u>respondeat</u> <u>superior</u> -- that is, a municipality cannot be held liable for its employees' torts solely by virtue of an employment relationship. <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978). A municipality is liable for its employees' violations of Section 1983 only if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Id.</u> at 694.

A plaintiff can demonstrate the existence of a governmental policy by showing "that a decisionmaker possessing final authority to establish municipal policy with respect to the action issued an official statement of policy." <u>Jiminez v. All American Rathskeller, Inc.</u>, 503 F.3d 247, 250 (3d Cir. 2007) (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986)) (internal quotations and alterations omitted). To show a custom, a plaintiff must establish that state officials engaged in a course of conduct so permanent and well-settled that it operated as law. <u>Id.</u> (citing <u>Monell</u>, 436 U.S. at 690).

In either case, a plaintiff bears the burden of showing a governmental policymaker's responsibility for, or acquiescence to, the official's actions. <u>Id.</u> (citing <u>Andrews v. City of Phila.</u>, 895 F.2d 1496, 1480 (3d Cir. 1990)). A plaintiff may not need to specifically identify the responsible decisionmaker, since practices that are considered customs under <u>Monell</u> are ascribable to the municipal decisionmakers. <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir.

1990). Thus, even if a custom "has not been formally approved by an appropriate decisionmaker" it "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Board of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

To be liable under Section 1983, "the government must act with deliberate indifference to the purported constitutional deprivation." Jiminez, 503 F.3d at 250. As a result, a failure to train may constitute a policy or custom giving rise to Section 1983 liability for a municipality only if that failure demonstrates deliberate indifference to residents' constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 389 (1989). A failure to train evinces deliberate indifference if

> in light of the duties assigned to specific officers or employees the
> need for more or different training is so obvious, and the
> inadequacy so likely to result in the violation of constitutional
> rights, that the policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need.

Id. at 390.

There must also be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation to ground municipal liability." Jiminez, 503 F.3d at 249-50 (quoting City of Canton, 489 U.S. at 385) (internal quotations omitted). It is not enough to claim that an injury could have been avoided by more or better training -- the deficiency identified by a plaintiff must be closely related to the ultimate injury. Grazier ex rel. White v. City of Phila., 328 F.3d 120, 125 (3d Cir. 2003) (citing City of Canton, 489 U.S. at 390-91). As our Court of Appeals has explained, such causation is often a question for the jury:

> [T]o sustain a § 1983 action against the City, plaintiffs must simply
> establish a municipal custom coupled with causation – i.e., that
> policymakers were aware of similar unlawful conduct in the past,
> but failed to take precautions against future violations, and that this
> failure, at least in part, led to their injury. If the City is shown to
> have tolerated known misconduct by police officers, the issue

21

> whether the City's inaction contributed to the individual officers'
> decision to arrest the plaintiffs unlawfully in [a given] instance is a
> question of fact for the jury.

Bielevicz, 915 F.2d at 851.

The City of Philadelphia contends that we should dismiss Kingsmill's claims against it because Kingsmill "simply parrots the legal standard for municipal liability under § 1983 without pleading any supporting facts." MTD at 11. Kingsmill argues that since he (1) specifically alleges that the City tolerated Officer Szewczak's history of misconduct, including prior constitutional violations, and (2) alleges that the City failed to investigate post-incident allegations that Kingsmill had been a victim of a serious crime and mistreated by Officer Szewczak, he has alleged sufficient facts to survive the City's motion to dismiss. Pl. Resp. at unnumbered pp. 16-17.

While a municipality's tolerance for known misconduct by police officers may ground a Section 1983 claim, Kingsmill's only allegation in this regard is that "Defendant City of Philadelphia maintained a policy or custom of inadequate supervision and discipline of Police Officer Szewczak whose prior constitutional violations and acts of misconduct were tolerated by the City of Philadelphia." Am. Compl. at ¶ 44. Even though we must draw all reasonable inferences in Kingsmill's favor and accept his well-pled factual allegations as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. This bare allegation of Officer Szewczak's alleged prior misconduct, and the City of Philadelphia's knowledge of it, constitutes is a legal conclusion styled as a factual allegation. Similarly, Kingsmill's allegation that the City of Philadelphia failed to investigate his post-incident allegations does not suffice to show or plead a custom or policy of failing to investigate or follow established policies, procedures, or directives: a practice must be "so permanent and

well settled as to have the force of law" to reach that threshold. Bielevicz, 915 F.2d at 850. Nor may we ordinarily infer a policy from a single instance of supposed illegality. Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 911 (3d Cir. 1984).

As Kingsmill fails to allege well-pled facts in support of his Monell claim with respect to either a policy or custom and proximate cause, this claim fails. We will therefore dismiss Count II of the amended complaint against the City of Philadelphia.

**V.**     **Conclusion**

Kingsmill's amended complaint pleads sufficient facts, accepted as true, to demonstrate that Officer Szewczak violated his Fourteenth Amendment substantive due process rights under a state-created danger theory of liability. Officer Szewczak is not entitled to qualified immunity because a reasonable officer at the time of the incident would have known that such conduct was unlawful. But Kingsmill fails to state a Monell claim against the City of Philadelphia. We will therefore deny defendants' motion to dismiss with respect to Count I and grant defendants' motion to dismiss Count II of the amended complaint. An appropriate Order follows.

BY THE COURT:

_/s/ Stewart Dalzell, J.
Stewart Dalzell, J.